IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 02:06cr198-WKW |
| | ) | |
| RONALD MCQUEEN | ) | |

### GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS

Comes now the United States of America, by and through Leura G. Canary, United States Attorney for the Middle District of Alabama, and respectfully submits the government's response to the defendant' motion to suppress (Doc. 23).

Ronald McQueen's ("McQueen") motion to suppress should be denied. Law enforcement agents searched the residence leased by Ronald McQueen and Terra Aaron, located at 8833 Ashland Park Drive, in Montgomery, Alabama, pursuant to a lawfully issued search warrant. McQueen initiated communication with Detective T.D. James ("Det. James") after his arrest. Post *Miranda*, McQueen admitted ownership of the drugs found at 8833 Ashland Park Drive, and the drugs found at his mother's residence, 2200 Windsor Avenue. Finally, Post *Miranda,* McQueen admitted owning the cocaine found in the Saturn. McQueen's arguments to suppress evidence and statements made by him are meritless.

**I.    Background.**

During the month of June, 2006, Montgomery Police Detective T.D. James ("Det. James"), received a telephone call from a confidential and reliable informant ("CS") regarding Ronald McQueen.  The CS told Det. James that (1) he saw McQueen in possession of large quantities of marijuana and cocaine on several occasions; (2) McQueen had approached him and

told him that he knew the CS could sell large quantities of cocaine; (3) McQueen's source was from Texas; and (4) McQueen had been previously arrested for drug trafficking and murder in Montgomery, Alabama. Det. James verified the information provided by the CS and learned that McQueen had several outstanding arrest warrants issued by the City of Montgomery.

In early July, based upon the information provided by the CS, Det. James and other agents set up a surveillance of McQueen at 8833 Ashland Park Drive and 2200 Windsor Avenue, both in Montgomery, Alabama. During the surveillance, Det. James determined that McQueen could always be found at 8833 Ashland Park Drive or 2200 Windsor Avenue. Agents also determined that McQueen drove a silver/blue 1999 Ford Mustang.

On July 15, 2006, the CS contacted Det. James and told him he had a conversation with McQueen. McQueen said his source from Texas would be in Montgomery later that day. McQueen told the CS that the narcotics would arrive on July 16, 2006, but the quantity was smaller than before because of the type vehicle bringing the narcotics. McQueen and the CS agreed to meet on July 16, 2006. On July 16, 2006, Det. James and the CS tried to make a controlled buy from McQueen. McQueen told the CS that he had to sell the one kilogram of cocaine he had left because his source was ready to leave Montgomery. Det. James and the CS were not able to arrange the controlled buy because McQueen's source wanted to leave town. Approximately two weeks later, McQueen and the CS negotiated a purchase of 2 kilograms of cocaine hydrochloride.

On July 26, 2006, the CS and McQueen met to make further arrangements. McQueen told the CS that he was going home and would meet with the CS the following day to arrange the sale. Shortly after the CS and McQueen met, agents went to 8833 Ashland Park Drive where

they say McQueen's Ford Mustang was parked in the driveway. The agents maintained surveillance until the next morning.

On July 27, 2006, the agents saw McQueen drive Terra Aaron from 8833 Ashland Park Drive to what was later determined to be her workplace. McQueen returned to the residence and left again. After meeting with McQueen, the CS told Det. James that McQueen was going to another section of Montgomery. The agents lost contact with McQueen for approximately thirty minutes before they were able to see him again. The agents followed McQueen back to 8833 Ashland Park Drive. McQueen went from Ashland Park Drive to 2200 Windsor Avenue. Det. James asked the CS to telephone McQueen to see if McQueen had the cocaine. The CS told Det. James that, although McQueen attempted to muffle his voice, he could hear McQueen ask an unknown person how much two (2) kilograms of cocaine would cost. The unknown person told McQueen $19,500 per kilogram. McQueen then told the CS, $19,500 a piece. The CS told McQueen he had the money and McQueen should meet him at a house on Cherry Street. McQueen said that he would meet the CS after he picked his girlfriend up from work.

Agents saw McQueen leave 2200 Windsor Avenue in the Ford Mustang, and pick his girlfriend up from work. McQueen drove to various locations and the agents temporarily lost sight of McQueen.[1] When the agents saw the Mustang again, it was being driven by Terra Aaron, who had a female passenger. McQueen was spotted as he approached Cherry Street to meet the CS. Agents on surveillance around Cherry Street recognized McQueen as he drove by in a Saturn SL2.

---

[1] Although the agents temporarily lost sight of McQueen, the CS and McQueen were in constant telephone contact during the various transports, trips to and from his residence, and the final destination on Cherry Street.

3

McQueen pulled into the driveway of the Cherry Street house, immediately put his car in reverse and pulled out again. Sgt. Michael Drummond turned on the lights and sirens of his unmarked police vehicle to stop McQueen for the outstanding warrants and the narcotics investigation. McQueen stopped his car, put it in reverse and backed up for approximately two blocks. McQueen stopped his car, jumped out and attempted to flee on foot but Sgt. Drummond took McQueen into custody after a short foot pursuit.

Sgt. Drummond found 2.5 grams of ecstasy in McQueen's front pocket, and two (2) kilograms of cocaine hydrochloride wrapped in cellophane and black tape in a backpack on the rear passenger seat floorboard of the Saturn SL2 driven by McQueen.

Agents who were watching 2200 Windsor Avenue approached the residence and made contact with Larry Mitchell who said that he lived at the residence. Mitchell gave the agents verbal consent to search the residence where they found 460 grams of marijuana, 240 grams of cocaine hydrochloride and two digital scales. All the items were seized from a dresser drawer of the east bedroom.

Agents secured 8833 Ashland Park Drive until Det. James obtained a search warrant. The original search warrant was a documents search warrant and the agents found a lease agreement 8833 Ashland Park Drive, signed by Tera Aaron and Ronald McQueen on May 8, 2006. After finding marijuana in the master bedroom closet, the search was suspended until Det. James obtained a second search warrant to allow the officers to search and seize narcotics. The search concluded after the agents found four (4) pounds of marijuana, six (6) grams of ecstasy (MDMA), $2,641.00 in assorted U.S. currency, one (1) gram of cocaine hydrochloride and a Lorcin .25 caliber handgun.

While in custody, McQueen and Aaron read their *Miranda* rights and agreed to give a statement. Prior to reading McQueen his *Miranda* rights, McQueen made a spontaneous remark that " Ms. Aaron didn't have anything to do with it." McQueen gave a full confession to knowingly possessing the drugs at both residences and the two kilograms of cocaine hydrochloride found in the Saturn. McQueen also told Det. James where the marijuana had been located at 8833 Ashland Park Drive.

II.     Argument.

    A.     **The Search Warrant Affidavit for 8833 Ashland Park Drive Was Not Based Upon Stale Unreliable Information**

McQueen argues that the information contained in the application for the search warrant was based upon unreliable and stale information. The United States submits the contentions are without merit. To establish probable cause, the government "must reveal facts that make it likely that the items being sought are in that place when the warrant issues." *United States v. Green*, 40 F.3d 1167, 1172 (11th Cir. 1994), *United States v. Harris*, 20 F. 3d 445, 450 (11th Cir. 1994) (quoting *United States v. Domme*, 753 F.2d 950, 953 (11th Cir. 1985). In *Green*, the Court said "[i]nformation must be timely for probable cause to exist, [as] probable cause must exist at the time the magistrate judge issues the search warrant. *Harris* at 450. Stale information is not fatal where the government's affidavit 'updates, substantiates, or corroborates the stale material." In this case, Det. James, the CS, Sgt. Drummond and other agents, monitored McQueen's movements and maintained surveillance at both of McQueen's residences. The information contained in the affidavit for the search contained information that began in mid June and was continuously updated to include the day the search warrant was issued. Det. James

was in constant contact with the CS, who provided information regarding McQueen's activities to law enforcement agents. The agents were able to corroborate and substantiate information provided by the CS with operative surveillance of McQueen. *See also, United States v. Magluta*, 198, F.3d 1265 (11th Cir. 1999). The reliability of the CS was established with the same corroboration used to establish probable cause.

      **B.**      **Sgt. Drummond Had Reasonable, Articulable Suspicion to Stop McQueen's Car and Arrest McQueen.**

The law is well settled that the Fourth Amendment protects persons from "unreasonable searches and seizures" by the government, and its protections extend to brief investigatory stops of persons or vehicles" if the officer has "reasonable [articulable] suspicion to believe that criminal activity" 'may be afoot." *United States v. Arvizu,* 534 U.S. 266, 273 (2002); *Terry v. Ohio*, 392 U.S. 1, 9 (1968); *United States v. Sokolow*, 409 U.S. 1, 7 (1989). "Whether reasonable suspicion exists at the time [of the investigatory stop] is a question of law to be determined ultimately by judges, not policemen.... [T]he question... actually and subjectively had the pertinent reasonable suspicion, but whether, given the circumstances, reasonable suspicion objectively existed to justify such a search." *United States v. Nunez*, 455 F.3d 1223, 1225 (11th Cir. 2006), (citing *Hicks v. Moore*, 422 F.3d 1246, 1252 (11th Cir. 2005).

In this case, Sgt. Drummond was aware that McQueen had made arrangements to meet the CS on Cherry Street to sell him two (2) kilograms of cocaine hydrochloride. The agents monitored McQueen's movement for two days.[2] The officers knew McQueen told the CS that his source was in town and McQueen had the drugs in his possession. The agents knew that the

---

[2] The agents monitored McQueen's movement minus the short period of time McQueen traveled in the New Town area and a short period of time in which he changed cars.

CS told McQueen that he had the money to make the purchase. Finally, the agents knew McQueen had several outstanding arrest warrants issued by the City of Montgomery. Notwithstanding the agent's reasonable articulable suspicion, McQueen attempted to flee when he recognized the presence of law enforcement agents. In *Illinois v. Wardlow*, 528 U.S. 119, 119-120 (2000), the Supreme Court held that "unprovoked flight that aroused the officers' suspicion. Nervous, evasive behavior is another pertinent factor in determining reasonable suspicion." *See also, Florida v. Royer,* 460 U.S. 491, 498 (1983), holding that an individual, when approached, has a right to ignore the police and go about his business. Unprovoked flight is the exact opposite of "going about one's business." Sgt. Drummond was justified in stopping and ultimately arresting McQueen; therefore, McQueen's motion to exclude evidence seized during the stop of McQueen's car should be denied.

  Although McQueen correctly cites case law related to the protections of the Fourth Amendment, the cases cited clearly support the government's arguments when applied to the facts of this case.

  Moreover, based upon the facts of this case, the officers had reason to believe that contraband was in the car driven by McQueen. In *Chambers,* the Supreme Court held that when there is probable cause to believe that contraband is in a vehicle, the vehicle may be searched without a warrant. *Chambers, at* 50-52. Courts have recognized that because exigent circumstances exist in the mobility of cars, a warrantless search is justified. *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996). *See also, Maryland v. Dyson,* 527 U.S. 465, 467 (1999); *United States v. Watts*, 329 F. Ed 1282, 1284 (11th Cir. 2003); and *United States v. Ross*, 456 U.S. 798, 809 (1982)( holding that if there [is] probable cause to search a vehicle, a warrantless

search would not be deemed in contravention of the Fourth Amendment if the facts of the case would have justified a warrant., 'even though a warrant has not actually been obtained.'"). In this case, a controlled buy was discussed on or about July 15, 2006. The buy was not completed because the source was in a hurry to leave town. A controlled buy was arranged on July 27, 2006. The officers on surveillance were aware of the arrangements including the fact that the buy was arranged to take place on Cherry Street. McQueen's attempt to flee provided additional probable cause to stop and search McQueen's car.

      **C.    The Search at 8833 Ashland Park Drive Was Pursuant to a Valid Search Warrant Describing the Items To Be Seized.**

McQueen further contends the search of 8833 Ashland Park Drive only authorized the seizure of non-drug items. The face of the search warrant and the attachments thereto, do not support McQueen's contentions. The heading of the search warrant does state "DOCUMENT SEARCH WARRANT." However, the body of the search warrant states the following:

> **You are hereby commanded to make immediate search of:**
> 8833 Ashland Park [Drive], Montgomery, Alabama; any person, outbuildings, and vehicles located within the curtilage thereof.
> **For the following property:** U.S. Currency, records, books, computers, notes, ledgers and/or items listed in Attachments I or II.

Attachment I describes all items with any indicia of drug trafficking, including "paraphernalia for packages, cutting , weighing, and distributing controlled substances, including, but not limited to, scales, baggies, spoons, walkie-talkies, CB's, night vision devices, police scanners, binoculars and parabolic microphones." It was not unreasonable to search the residence to find items related to trafficking in controlled substances since the agents had already seized two (2) kilograms of cocaine hydrochloride from McQueen. Although "if a search

exceeds the scope of the terms of a warrant, any subsequent seizure is unconstitutional," "a search may be extensive as reasonably necessary as required to locate the items described in the warrant, and is generally 'not limited by the possibility that separate acts of entry or opening may be required to complete the search'." *See United v. Jackson*, 120 F.3d 1226, 1228 (11th Cir. 1997). In this case, the agents did not complete the search or seize anything when they located a controlled substance. Instead, the residence was secured until Det. James was able to request and receive a drug search warrant. Therefore, all items, including the drug evidence, were lawfully seized from 8833 Ashland Park Drive. The drugs found prior to the issuance of the second search warrant are admissible because they were found in a place where documents could have been stored.

      **D.**    **The Search of 2200 Windsor Avenue Was Pursuant to a Valid Consent; Therefore, Evidence Seized Is Admissible.**

The law is settled that permission to conduct a consensual search of property owned or occupied by a prospective defendant may be obtained from another person who possesses 'common authority over or other sufficient relationship premises'." *United States v. Backus*, 349 F.3d 1298, 1299 (11th Cir. 2003). *See, United States v. Matlock*, 415 U.S. 164, 171 (1974). In *Brackus*, a battered and estranged wife maintained authority to grant consent to search. In *Matlock*, the Supreme Court held that common authority "rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Matlock* at 171.

In this case, Larry Mitchell told the agents that he lived at 2200 Windsor Avenue and gave them permission to search the residence. There is no indication that consent to search was limited to a particular area. McQueen correctly refers to *Matlock* and *Backus*.

McQueen concedes, and the surveillance established, that he "has and does stay at his mother's residence 2200 Windsor Avenue." (Doc. 23 at p. 8). Therefore, his application of the holdings in *Matlock* and *Backus* to the facts of this case is inappropriate. Moreover, McQueen does not challenge the voluntariness of the consent nor does McQueen allege that Larry Mitchell was coerced or threatened in any way. Therefore, the consent was a voluntary consent to search the premises.

      **E.**      **McQueen's Post Miranda Statements are Admissible**.

A defendant who is in custody must be advised of his rights to remain silent and the right to be represented by counsel prior to interrogation by law enforcement. *See, Miranda v. Arizona*, 384 U.S. 436 (1966). The parties do not dispute that McQueen was in custody at the time he gave the agents a recorded statement. McQueen does not dispute that he received *Miranda* rights prior to being interrogated and giving a recorded statement. In fact, McQueen made a spontaneous statement to Det. James before *Miranda* warnings in an effort to exonerate Tera Aaron of any liability for the drugs found at 8833 Ashland Park Drive. After his spontaneous statement, McQueen was told his *Miranda* rights. McQueen made further admissions in an effort to exonerate his mother. The foregoing facts show McQueen knowingly and voluntarily waived his rights. McQueen's statements are admissible since all confessions are admissible unless it is proven that the statement was not voluntarily given. The government did not violate the defendant's rights under the Fourth or Fifth Amendments and McQueen's statements are

10

admissible.

## CONCLUSION

For the reasons stated above, the defendant's motion to suppress should be denied.

Respectfully submitted on this 25th day of September 2006.

        LEURA G. CANARY
        UNITED STATES ATTORNEY

        /s/Tommie Brown Hardwick
        TOMMIE BROWN HARDWICK
        One Court Square, Suite 201
        Montgomery, AL 36104
        Phone:  (334) 223-7280
        Fax:  (334) 223-7135
        E-mail:  tommie.hardwick@usdoj.gov
        ASB4152 W86T

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 02:06cr198-WKW |
| | ) | |
| RONALD MCQUEEN | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on September 25, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Susan G. James, Esq.

        Respectfully submitted,

        /s/Tommie Brown Hardwick
        TOMMIE BROWN HARDWICK
        One Court Square, Suite 201
        Montgomery, AL 36104
        Phone: (334)223-7280
        Fax: (334)223-7135
        E-mail: tommie.hardwick@usdoj.gov
        ASB4152 W86T