IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATE OF AMERICA | ) | |
| | ) | |
| v | ) | CR. NO. 2:06cr198-WKW |
| | ) | (WO) |
| RONALD MCQUEEN | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

The defendant, Ronald McQueen ("McQueen"), is charged in a one-count indictment with possession with intent to distribute cocaine and marijuana in violation of 28 U.S.C. § 841(a)(1). On September 13, 2006, the defendant filed a motion to suppress, in which he asserts that the search warrant for a search of his residence was unconstitutionally deficient and that the affidavit filed in support of the warrant did not establish probable cause. (Doc. No. 23.) He also contends that the police lacked probable cause to stop and search his vehicle. Finally, he asserts that the search of his mother's residence was illegal because the police failed to obtain proper consent to search his bedroom. The court held an evidentiary hearing on the motion on November 13, 2006. Based on the motion, the evidence presented to the court and the briefs and argument of the parties, the court concludes that the motion to suppress is due to be denied.

**FACTS**

In June 2006, Montgomery Police Department Detective T.D. James ("Detective James") received information from a confidential informant that McQueen was a supplier of cocaine and marijuana around the Montgomery area. The informant also indicated that, at some point, he saw McQueen in possession of narcotics in an open area in Trenholm Court.

On July 15, 2005, the confidential informant informed Detective James that McQueen's "source" from Texas was in town. The next day, the informant called Detective James and told him that McQueen had one kilo of cocaine to sell. Detective James attempted to arrange a drug buy from McQueen; however, several members of the Drug Task Force were unavailable to participate in surveillance that day and nothing happened. Another opportunity arose on July 26, 2006, when the confidential informant informed Detective James that McQueen's source had returned to town. Detective James then began making arrangements for the confidential informant to participate in a controlled drug buy with McQueen.

Later that day, members of the Drug Task Force began surveillance of an apartment at 8833 Ashland Park, where McQueen and his girlfriend were thought to reside. McQueen remained at the residence overnight. The next morning, Detective James and several other officers began following McQueen. The confidential informant rode in Detective James' vehicle. When McQueen left the apartment in a Ford Mustang and drove his girlfriend to an assisted living center, the confidential informant called McQueen and arranged to meet him in front of a residence on Cherry Street. The informant agreed to purchase two kilograms of cocaine at $19,500 per kilogram from McQueen.

During the surveillance, officers lost sight of McQueen's vehicle. Ten minutes later, officers saw McQueen's girlfriend driving alone in McQueen's Mustang. The informant called McQueen and McQueen told him that he was "five minutes away." After a few minutes passed, Officer Mike Drummond ("Officer Drummond") spotted McQueen driving

down Cherry Street in a tan Saturn vehicle. Immediately after McQueen pulled into the driveway next to a residence on 2200 Cherry Street, he backed out of the driveway and began driving down the street toward Officer Drummond's vehicle. When Officer Drummond turned on his blue light, McQueen "threw the car in reverse" and began driving in reverse gear down Cherry Street. When a police vehicle blocked McQueen's vehicle, McQueen got out of his car and began running away. Officer Drummond chased McQueen approximately 100 yards and took him into custody on outstanding capias warrants. During the chase, another officer remained with McQueen's car which was searched after McQueen was in custody. Two kilograms of cocaine were found on the rear floorboard of the passenger's side of the vehicle.

Around 3:45 p.m., Detective James obtained a warrant from a Montgomery County Municipal Court judge to search the apartment at 8833 Ashland Drive for "U.S. Currency, records, books, computers, notes, ledgers and/or items listed in Attachments I or II." (Doc. No. 36, Gov's Ex. A.) The affidavit, in pertinent part, is as follows:

> Based upon the affiant's training, experience and participation in other controlled substance investigations, he knows the following:
>
> A) That the sale of cocaine and other controlled substances generates large quantities of United States Currency usually in small denominations;
>
> B) That the courts have recognized that the small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried and concealed may establish probable cause that there is a substantial

         connection between the questionable currency and narcotics transactions;

C)     That the Currency Transaction Report (CTR) (IRS Form 4789), which is required to be completed and filed with the IRS by all financial institutions on every currency transaction which exceeds $10,000.00 causes tremendous problems for narcotics traffickers when they attempt to negotiate their illegal profits at a financial institution, causing them to maintain large amounts of cash on hand;

D)     That the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances;

E)     That large-scale narcotics traffickers must maintain, on hand, large amounts of United States Currency in order to maintain and finance their ongoing narcotics business;

F)     That it is common for narcotics traffickers to maintain books, records, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation.

Based on this affiant's training and experience he has probable cause to believe and does believe that drug records, telephone tolls, currency and other items listed above and in Attachment I are being stored and/or concealed in the 8833 Ashland Park Drive, Montgomery, Alabama; and any persons, outbuildings, and vehicles located within the curtilage thereof.

1)     Probable cause being that in the month of July 2006, Detective T.D. James received information from a confidential and reliable informant, hereafter referred to as "A," observed Ronald McQueen sell, deliver, and possess large

      quantities of cocaine on numerous occasions.

2) Further probable cause being that "A" provided information that Ronald McQueen would be delivering two kilos of cocaine to the 2200 block of Cherry Street, Montgomery, Alabama on July 27th 2006.

3) Further probable cause being that on July 26th and 27th 2006, the Special Operations Division conducted surveillance on Ronald McQueen from 8833 Ashland Park Drive to numerous stops through the Montgomery County area.

4) Further probable cause being that during the surveillance McQueen was observed traveling to 8833 Ashland Park Drive, Montgomery, Alabama on three separate occasions.

5) Further probable cause being that at approximately 1345 hours, Ronald McQueen left 8833 Ashland Park Drive and traveled to the 2200 block of Cherry Street, Montgomery, Alabama.

6) After observing McQueen on Cherry Street the Special Operations Division attempted to conduct an[] investigative stop when the subject fled in the vehicle and on foot before being apprehended. Located in the vehicle was approximately two kilos of cocaine in the back passenger floorboard. There were no other occupants in the vehicle.

7) Further probable cause that upon further investigation a boarding pass to the Bahamas was listed for Ronald McQueen with his address listed as 8833 Ashland Park Drive, Montgomery, Alabama.

8) Further probable cause being that "A" has provided accurate and reliable information in this and other cases that has been verified by the

>Montgomery Police Department.

(*Id.*)

Attachment I of the affidavit also listed several specific items which could be expected to be found at the Ashland Drive residence, including paraphernalia for packaging, cutting, weighing, and distributing controlled substances and books, records, and other evidence of the obtaining, secreting, transfer, concealment and/or the proceeds of illegal drug trafficking. (*Id.*)

During the execution of this search warrant, officers found several items indicating that McQueen resided at the Ashland Drive residence, including a light and telephone bill and a lease agreement. Upon finding marijuana in the apartment, the officers stopped the search and waited for the issuance of a drug search warrant. Detective James subsequently obtained a warrant from a Montgomery County Municipal judge to search the apartment for drugs. The affidavit states, in pertinent part:

> On July 27, 2006, the Montgomery Police Department's Narcotics Bureau executed a document search warrant at 8833 Ashland Park Drive. During the execution of the search warrant a quantity of marijuana was located inside of the residence. The document search warrant was immediately ceased and the residence was secured pending the court's approval of a drug search warrant.

(Gov's Ex. B.) After securing the search warrant, officers seized marijuana, cocaine, currency, a handgun, and other items from the apartment.

Around the time officers conducted a search of the Ashland Drive apartment, another officer knocked on the door of a residence on 2200 Windsor Avenue and asked for

permission to search the house. McQueen's aunt answered the door and told Corporal Hayes that she did not live at the residence. She told the officer to ask Larry Mitchell, a bedridden man in a downstairs bedroom, for permission to search the house. After Mr. Mitchell consented to a search of the residence, the officers began searching all of the rooms throughout the house. McQueen's mother, Brenda Waters, testified that, when she awoke from a nap and learned that officers were searching her house, she told officers that "it wasn't right" and that she was "real mad." Ms. Waters remained at the house during the search but never told officers to stop their search. The officers seized 460 grams of marijuana, 240 grams of cocaine, two digital scales, and paper documents from a rear bedroom.

## DISCUSSION

### A. The Warrant to Search 8833 Ashland Drive

McQueen claims that the search of his home was illegal because the documents search warrant did not particularly describe the drug-related items expected to be found in his apartment. McQueen contends also that stopping the search and amending the warrant after controlled substances were found did not cure any Fourth Amendment violation.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV.[1] "The Amendment protects persons against unreasonable searches of

---

[1] Specifically, the Fourth Amendment provides that "[]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly

"their persons [and] houses." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998). The Fourth Amendment further provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Probable cause to support a search warrant exists when "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999). Evidence seized as the result of an illegal search may not be used by the government in a subsequent criminal prosecution. *United States v. Martin*, 297 F.3d 1308, 1312 (11th Cir. 2002).

Items outside the scope of a search warrant may be seized only if the circumstances surrounding the search meet one of the recognized exceptions to the warrant requirement. One of these exceptions is the "plain view" doctrine. *Horton v. California*, 496 U.S. 128 (1990). Under the "plain view" doctrine, an item outside the scope of a search warrant may be properly seized only if: (1) the officer is authorized to be in the area; (2) the officer looks in places likely to contain the property; and (3) the item seized is immediately recognizable as incriminating in character. *Id.*, 495 U.S. at 142.

First, it is clear that the officers searched the apartment pursuant to a valid document search warrant. The evidentiary materials clearly demonstrate that Detective James initially sought a warrant to search the Ashland Drive apartment for specific documents or

---

describing the place to be searched, and the persons or things to be seized."

8

paraphernalia related to the distribution of controlled substances.[2] The affidavit in support of the search warrant indicated that officers had observed McQueen leave the Ashland Drive apartment prior to driving to Cherry Street and that cocaine was found in McQueen's car. Thus, the affidavit indicated a fair probability that specific documents or paraphernalia related to the distribution of controlled substances would be found in the residence. This court therefore concludes that the affidavit described the items to be seized with sufficient particularity and that the issuance of the search warrant was supported by probable cause. Secondly, thee is no evidence that the officers were searching in places unlikely to contain documents at the time they found four pounds of marijuana in the apartment.[3] Finally, the four pounds of marijuana were immediately recognizable as incriminating in character. Consequently, the initial search was authorized by the document search warrant and the subsequent seizure of marijuana was authorized by the "plain-view" doctrine. *See Horton*, *supra.* In addition, the seizure of the marijuana, as well as the six pounds of Ecstacy, one gram of cocaine, $2641 in currency, and the 25 caliber handgun, were discovered during a lawful search authorized by a valid drug search warrant.

McQueen also asserts that the affidavit in support of the document search warrant failed to establish probable cause because the affidavit contained no information about the

---

[2] During the hearing, Detective James testified that a document search warrant was also necessary to determine whether McQueen resided at the residence.

[3] Although Detective James testified that the four pounds of marijuana were found while the officers were looking for documents, the court is unable to discern the exact location that the marijuana was found. Nonetheless, the defendant presented no evidence that the marijuana was stored in a place where documents, such as telephone bills and lease agreements, could not be stored. Moreover, it is not reasonable to believe that four pounds of marijuana could be stored in a place where a sheet of paper could not be stored.

confidential informant's reliability.[4]

A court reviewing the issuance of a search warrant by a state court judge is not to conduct a de novo probable cause determination, but is merely to decide whether the evidence viewed as a whole provided a "substantial basis" for the finding of probable cause at the time the warrant was issued. *Massachusetts v. Upton*, 466 U.S. 727, 732-33 (1984) (per curiam).

> The task of the issuing [judge] is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the [judge] had a "substantial basis for . . . conclud[ing]" that probable cause existed. *Jones v. United States, supra,* 362 U.S., at 271, 80 S.Ct., at 736.

*Gates,* 462 U.S. at 238-239. Traditionally, information derived from a confidential informant is scrutinized to determine the informant's reliability, veracity, and basis of knowledge to determine whether the information forms a basis for probable cause. *See Gates*, 462 U.S. at 230. The affidavit indicates that, at some point in July 2006, the confidential informant contacted Detective James and informed him that he had observed McQueen sell, deliver, and possess large quantities of cocaine. Thus, the affidavit specified the basis of the informant's knowledge.[5] The informant also indicated that McQueen would

---

[4] In his motion to suppress, McQueen also asserts that the information in the affidavit was stale. However, the face of the affidavit, as well as from testimony at the hearing on the motion to suppress, demonstrates that the information was not stale and that the information was corroborated and substantiated by the officers' surveillance of McQueen. *See U.S. v. Magluta*, 198 F.3d 1265, 1272 (11th Cir. 1989). Moreover, during the hearing, defense counsel conceded that the information was not stale.

[5] The affidavit also specified that the confidential informant "provided accurate and reliable information in this and other cases that has been verified by the Montgomery Police Department." (Doc. No. 36, Gov's Ex. A.) During the hearing, Detective James testified that, on July 16, 2006, the informant had

10

deliver two kilograms of cocaine to the 2200 block of Cherry Street on July 27, 2006 after they arrested him on outstanding warrants. The affidavit further indicated that law enforcement officials observed McQueen drive into a driveway on the 2200 block of Cherry Street and found two kilograms of cocaine in his car on July 27, 2006. Because the informant's information was corroborated by the law officers' investigation of McQueen, the court concludes that the affidavit sufficiently established the reliability of the informant.

In *Illinois v. Gates*, the Court "reaffirm[ed] the totality of the circumstances analysis that traditionally has informed probable cause determinations." 462 U.S. at 238. The court determined that factors such as an informant's veracity, reliability, and basis of knowledge "should be understood simply as closely intertwined issues that may usefully illuminate the common sense, practical question whether there is 'probable cause' to believe that contraband or evidence is located in a particular place." *Id.* at 230.

The question for this court is whether the information viewed as a whole provided a substantial basis for the issuing judge's finding of probable cause at the time the warrant was issued. *Massachusetts v. Upton*, *supra*. Based on the facts of this case, the court concludes that the affidavit contained information sufficient to establish a substantial basis for allowing a state court judge to find probable cause. In short, the court concludes that the affidavit sufficiently demonstrates that probable cause existed for the search of the residence.

---

provided information that McQueen wanted to sell one kilogram of cocaine. Although Detective James and the informant began arrangements for a drug buy on July 16, 2006, Detective James was unable to find a sufficient number of Drug Task Force members to assist him and the planned meeting was cancelled.

### B. The Stop and Search of McQueen's Car

McQueen asserts that the police lacked probable cause to stop and search his vehicle. At the time Officer Drummond stopped McQueen's vehicle on Cherry Street, he knew that there were outstanding warrants for the arrest of McQueen. Thus, the warrants themselves gave law enforcement officials probable cause to stop and arrest McQueen. Furthermore, "[o]nce an officer determines that there is probable cause to make an arrest, it is reasonable to allow officers to ensure their safety and to preserve evidence by searching the entire passenger compartment. *Thornton v. U.S.*, 541 U.S. 615, 623 (2004). *See also N.Y. v. Belton*, 453 U.S. 454, 463 (1981); *U.S. v. Robinson*, 414 U.S. 218, 234-35, and n. 5 (1973). Consequently, the search of the automobile and the seizure of the cocaine from the floorboard of the rear passenger seat was reasonable under the circumstances.

### C. The Consent to Search 2200 Windsor Avenue

McQueen asserts that the search of his mother's residence was unreasonable because Larry Mitchell did not have the authority to consent to search the house. Specifically, McQueen contends that Mr. Mitchell is bedridden and that, with the exception of his bedroom, he does not have access to other areas of the house.

A law enforcement officer's warrantless entry and search of a residence does not violate the Fourth Amendment's proscription of "unreasonable searches and seizures" if the officer obtained the consent of a third party who possessed common authority over the premises. *U.S. v. Matlock*, 415 U.S. 164 (1974). In addition, consent of a third-party lacking authority over the premises may nonetheless be valid under the Fourth Amendment if law

enforcement officials reasonably believed that the consenting party had authority to consent to the search. *Illinois v. Rodriguez*, 497 U.S. 177, 188-89 (1990); *U.S. v. Mathis*, 96 F.3d 1577 (11th Cir. 1996).

During the hearing on the motion to suppress, Ms. Waters testified that she owned the residence and that McQueen frequently stays there when "his old lady gets made at him." Mr. Mitchell also lives in the house; however, he uses a separate entrance to the residence because his electric wheelchair does not fit through the common entryway to his bedroom. Ms. Waters acknowledged that Mr. Mitchell's room is accessible from inside the house and that family members bring food and items to Mr. Mitchell from other parts of the residence. Given these facts, it is clear that Mr. Mitchell possessed common authority over the premises. More importantly, the court concludes that it was reasonable for the officers to believe that Mr. Mitchell had the authority to consent to the search. Testimony indicated that both Ms. Waters' sister and Mr. Mitchell told officers that Mr. Mitchell lived in the residence. In addition, Ms. Waters testified that, upon learning that Mr. Mitchell had consented to the search of her residence, she did not tell officers that Mr. Mitchell's consent was limited or ask the officers to leave. Consequently, Mr. Mitchell's consent to search the premises was valid under the Fourth Amendment.

## CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that the defendant's motion to suppress be denied. It is further

ORDERED that the parties shall file any objections to the said Recommendation on

or before **December 19, 2006.** Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party objects. Frivolous, conclusive or general objections will not be considered by the District Court.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a de novo determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 6th day of December, 2006.

        /s/Charles S. Coody
   CHARLES S. COODY
   CHIEF UNITED STATES MAGISTRATE JUDGE